# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7325 | **DATE** | 9/21/2004 |
| **CASE TITLE** | N.M. PATERSON & SONS LIMITED vs. M/V ETHEL E., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Judgment is entered in favor of plaintiff and against defendants M/V Ethel E., William C. Selvick and Curley's Marine Towing in the amount of $234,558.00 plus interest. This case is terminated. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | SEP 2 2 2004 | |
| ✓ | Docketing to mail notices. | | | date docketed | 52 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| CG | courtroom deputy's initials | | 2004 SEP 21 PM 4:19 U.S. DISTRICT COURT | SEP 2 2 2004 date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| N.M. PATERSON & SONS LIMITED, ) | |
| ) | 01 C 7325 |
| Plaintiff, ) | |
| ) | Judge Ronald A. Guzmán |
| v. ) | |
| ) | |
| M/V ETHEL E., WILLIAM C. ) | |
| SELVICK, CURLEY'S MARINE ) | |
| TOWING, and CRONIMET ) | |
| CORPORATION, ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

DOCKETED
SEP 2 2 2004

### Introduction

Plaintiff N.M. Paterson & Sons, Ltd. is a company formed under the laws of Canada with

its principal place of business located in Canada. Plaintiff is the owner of the vessel M/V

Paterson ("Paterson"), a Great Lakes bulk carrier registered in Canada. At 1:50 a.m. on October

7, 2000, after unloading its cargo at ACME Steel on the Calumet River, the Paterson departed

her unloading berth and proceeded on her journey back up the Calumet River towards Lake

Michigan. To aid him in his journey up the Calumet River, Capt. Guy Houde, master of the

1

Paterson, chose to hire one tugboat, the M/V Ethel E. ("Ethel E.").[1] The Ethel E. was captained by James Wray. The Ethel E. is owned by defendant William C. Selvick and is managed by defendant Curley's Marine Towing. On its way up the Calumet River towards Lake Michigan the Paterson, assisted by the Ethel E., grounded on the river bottom or on debris found on the river bottom, causing substantial damage to the boat's rudder and propellers. In this lawsuit the plaintiff, N.M. Paterson & Sons Ltd., claims that defendants Ethel E., Selvick, owner of the Ethel E., and Curley's Marine Towing, the managing entity of the Ethel E., were negligent in guiding the Paterson up the Calumet River thereby causing the damages the Paterson sustained. Defendants deny any negligence.

### Summary of Testimony and Facts

Thomas Karl Coates, a marine consultant, testified on behalf of plaintiffs. Coates has held various positions including mid-shipman, third mate, second mate, first mate and master on various shipping lines and is qualified to be master of almost any vessel anywhere. He is familiar with the use of tugboats. Coates commenced an investigation for the plaintiff in order to establish the cause of the accident. At the time he commenced his investigation, he was employed by the plaintiff as superintendent of hull and navigation. Since then, he has established his own business. As part of his investigation, Coates interviewed both the master and first officer of the Paterson. He testified that his investigation led him to conclude that the Paterson ran aground some 200 - 250 feet south of the 106th Street Bridge. The trailing edge of the rudder

---

[1] Capt. Houde has brought vessels into the Calumet River five or six times per year since 1997. He became captain of the Paterson in the fall of 1999. Capt. Houde considers himself an expert on the conditions of the Calumet River.

and tips of the propellers were damaged. The damage he observed while the ship was in dry dock is consistent with a ship that has run aground while going astern.

Coates testified that the typical use of a tugboat in a situation such as this is to keep the vessel being towed in the navigable channel. As the two vessels traveled through the Calumet River, the Ethel E. was in front of the Paterson and proceeded bow first, but the Paterson was traveling stern first. In other words, the two vessels were back-to-back during the tow. Coates also described the tugboat's duty as keeping the stern of the Paterson as close to the center of the channel as possible. Consistent with this opinion was the testimony of Capt. Houde, who indicated that when he left the dock, his instructions to the tugboat captain were that he "start pulling astern and then try to keep her in the middle as much as he can and that's the middle of the channel." According to Coates, although the Paterson needs two tugboats if it is loaded with cargo, when not loaded one tugboat is all that is required, as the ship is traveling under its own power, and the ship's master can use its bow thruster to steer that portion of the ship. Coates testified it is usual and customary for the Paterson to back out of the Calumet River because of the great difficulty a ship of that size would have in turning around after depositing its cargo in order to return upriver toward Lake Michigan bow first. Capt. Houde testified that even though there was a turning basin he could have used, his prior experience was that this basin was always full of barges and it would take forever to find their owners and get them removed in order to be able to utilize it.

On cross-examination Coates testified that neither the tugboat nor the Paterson was in

3

complete control of the steering of the Paterson, rather, navigating the Paterson through the Calumet River out to Lake Michigan was a joint undertaking which required coordination between both captains. This is so because the Paterson was not a powerless barge, but it retained power to move itself and with its steering and bow thruster could steer that portion of the ship, while the tugboat Ethel E., by means of a line attached to the stern, had influence over the stern of the ship as it led the Paterson stern first towards the lake. Capt. Houde described the interaction between the tugboat and his crew as "teamwork" during which the tug would sometimes give him advice on what to do and vice versa. According to the Ethel E. captain, Capt. James Wray, however, his responsibility when towing such a ship it is to get it out in the channel and then listen to the captain's commands.[2] However, he understood that it was his job to keep the ship in the center of the river. In Capt. Wray's understanding, the captain of the Paterson was in charge of the maneuver itself. He was there to assist. Coates also testified that pilots are neither required nor customary in situations such as this, as the captains/masters of the ships are considered sufficiently knowledgeable to be pilots. Capt. Houde testified that he did not have sounding charts for the Calumet River from the Army Corp of Engineers even though

---

[2] Capt. James Wray began as tugboat operator part time in 1964; went full time in 1966 and obtained his captain's license in 1967 or 1968. He has been working on the Calumet River and Lake Michigan ever since moving barges and towing ships. His current license is for Master of 1600 ton vessels for the Great Lakes and western rivers or inland waters. Initially he worked 27 years for Calumet Marine Towing as a towboat captain. Although he worked over the Great Lakes, he spent more time in Lake Michigan than any of the other lakes and much of this time on the Calumet River. He considers himself to be familiar with and to know the Calumet River. After leaving Calumet Marine Towing, he went to work for Hannah Marine Corporation for approximately seven years doing the same thing. Then, in March of 2000, he went to work for Marine Management where he currently works as captain and general manager. He has probably towed more than one hundred ships stern first out of the Calumet River. In all that time he has had no prior similar incidents on the Calumet River.

he had asked for them when he started as captain because the American charts they had were not sufficiently detailed, and he wanted to know how deep the river was.

In essence, Coates opined that the Ethel E. captain was deficient in several ways in fulfilling his responsibilities. The Ethel E. captain failed, when he found his view obstructed by glare, to take steps to secure a better view. He could simply have walked to another nearby location, placed a spotter of his own in an appropriate position, or notified the captain of the Paterson of his inability to see clearly. The Ethel E. captain, according to both Coates and Capt. Houde, was in a superior position to see how close the Paterson was coming to the side of the channel. According to Coates, the captain of the Ethel E. could have and should have alerted the Paterson's captain in time to avoid the grounding. Coates also opined that the Ethel E. captain was deficient in not knowing the contours of the bottom of the channel and in not communicating his knowledge of the same to the captain of the Paterson.

According to Coates and Capt. Houde, spotters were assigned at points of the Paterson by Capt. Houde to notify the captain of the ship's position relative to the banks of the channel.[3] Capt. Houde testified that he depended on both the tug and the spotters to tell him if he was getting too close to the bank of the river. In this case, Capt. Houde assigned first officer Dan

---

[3] The Paterson's procedural manual requires one lookout aft and one lookout forward while the vessel is in transit, although Tim Black testified that he knows of a lot of captains who go up and down the river who do not use spotters.

McDonald to be the spotter on the stern.[4] McDonald used a radio to communicate his

observations to the captain. The tugboat captain would also be relying on the spotter's

observations. McDonald, however, failed to communicate his sightings to the captain during the

crucial three to four minutes prior to the grounding. There was conflicting testimony as to what

could have caused this failure of communication. There was some testimony that one of the crew

saw McDonald absent from his post. There was also testimony that McDonald's radio may have

been set to the wrong channel or frequency for communication with the captains of the Ethel E.

and the Paterson; that it could have been simply that McDonald's radio signal was blocked by

some part of the ship; or that the radio was not turned on. At any rate, according to Coates, the

custom is for the spotter to require acknowledgment from the captain of his communicated

observations. Therefore, even if he was properly on duty and attempting to relay information,

McDonald ought to have known that his communications were not getting through. Coates also

testified that as first officer, McDonald would be expected to know where to stand on the ship so

that his signal would get through to the captain. Tim Black, charged with investigating and

writing a report as to the cause of the accident by N. M. Paterson & Sons, concluded that the first

officer, Dan McDonald, was not at his location as a spotter, but rather that he went into the galley

to get a cup of coffee.[5] For that reason, or possibly because McDonald forgot to turn his radio

---

[4] According to Capt. Houde, there was also an unlicensed crewman with the first officer
on the stern of the ship.

[5] Black was the marine superintendent of engineering with N.M. Paterson & Sons at the
time of the incident. Black was previously the chief engineer for the Paterson. As marine
superintendent, his duties were to insure the safe and efficient operation of the engineering
department on all vessels. He has done this type of investigation for the company before, and it is
one of his many responsibilities to do these types of investigations when requested. Subsequent
to this investigation he wrote a report of October 27, 2000. The investigation was an internal one

up, Capt. Houde did not get the required spots to avoid hitting the dock, which caused major

damage and expense to the Paterson. Black bases this conclusion on the discussions he had with

the watchman, the third mate, and the first mate during his investigation of the incident.

According to Black, there was a failure of communication, and the captain did not get the

information necessary to do his job properly. The cause of the failure of communication is not

clear to the Court. It could have been any one of the aforementioned things or a combination.

However, what is clear is that both Capt. Houde and Capt. Wray were relying upon these

observations to help them maintain the ship centered within the navigable channel. Coates

believed this failure on McDonald's part was so critical that he recommended McDonald be

discharged from his position. Capt. Houde wrote a statement indicating that he would not be

comfortable having McDonald work under his command again, as he would never be able to

trust him. On redirect examination, Coates clarified that he subsequently offered to rehire

McDonald, believing that his conclusion that McDonald voluntarily absented himself from his

post may have been hasty. However, it is not McDonald's employment or loss of employment

that is important to the resolution of this case. It is not crucial for us to determine precisely why

McDonald failed to communicate with his captain. The significance of the fact that the plaintiff

considered firing McDonald for failing to do so is that it highlights how critical his observations

were to the steering of the ship. This is especially true as both the ship and the tugboat were

relying on these observations. Without these observations, Capt. Houde would have no idea how

close to the shore the ship was. As a result, he would be of no help whatsoever in determining

---

and he did not consider the possible fault of any third parties, such as the tug or the dock owners
in his investigation or his report. He is not, however, an expert on navigation issues and holds no
deck licenses.

what action, if any, needed to be taken. If it is true, as plaintiff's experts have testified, that the

steering of the ship back up the river was a team effort between the two captains, then

McDonald's failure to live up to his responsibilities effectively sidelined half of the team. Capt.

Wray was left on his own to attempt to adapt to the new circumstances.

Capt. James Wray was the captain of the towboat Ethel E. towing the Paterson out of the

Calumet River. The typical crew for the Ethel E. is a captain, an engineer/deck hand, and a

second deck hand. His crew's primary purpose after securing to the vessel is to standby and be

ready if something should happen to let a tow line go. They do not ordinarily act as lookouts for

him. He is the only lookout on the boat. His eye level is approximately 10 feet above the water

level. The Ethel E.'s pilot house has windows all the way around so that one can see 360 degrees.

Although he recalls asking the Paterson for help, Capt. Wray cannot recall why -- whether

it was because he could not get the ship over alone, it was just going too fast, or some other

reason. When lining up for the 106th Street Bridge, he likes to keep the speed of the ship under

1.5 knots. He has no specific recollection of checking his speed as he lined up for the Bridge on

the occasion in question, but he does know that the speed was at least under 1.5 knots. He would

have made sure of this from habit. He stated he does not need to check his GPS in order to judge

the speed of the tow. In his report to the Coast Guard, Capt. Wray stated:

> While towing out, the ship took a sheer to port. I pulled up to his
> starboard and told the Captain to come ahead full hard over to help
> me get the stern up in the center away from the dock. The deck
> crew had not said signals in a while, and with glare in the
> windows, I could not tell right away the ship was sheering off to

port. After we got straightened out, the Captain could not -- still
not get his crew on the radio to answer. I did not think very [*sic*]
stern or rudder touched the dock. It did not look like it from where
I was.

The glare referred to was from all of the lights around the area reflecting on the tugboat's

windows. Capt. Wray testified that it was possible for him to step away from the controls for a

brief moment and go by the door. Presumably this could be done in order to look outside and

avoid the glare of the windows. He cannot recall if there was any reason why he could not have

done that the night of the accident. Capt. Wray testified that he could not see the distance

between the ship and the shore because he was on the other side of the ship, the starboard side of

the ship, trying to pull the ship into the center. Knowing how far the port side of the ship was

from the dock would definitely have helped. The reason he suggested to Capt. Houde that he

come ahead and put his rudder over hard is that even though he could not see, he felt from the

distance to the west bank, which he could see, that the ship was coming too close to the eastern

side of the channel. This dialogue occurred at a time when they were getting no communication

from the spotters.


Capt. Wray knows who the captain of the Paterson was that evening because he had

towed him many times before. He cannot recall any specific instructions given to him by Capt.

Houde that night. He does recall, however, that Capt. Houde was having problems with his crew

in that they quit giving signals (distances) to the captain and he got a little mad over it and could

not get them on the radio to find out what was going on. Capt. Houde could not get in touch with

his crew, and he was asking them where they were or why they were not answering over the

radio. Capt. Wray also relied somewhat on the Paterson crew's reports in doing his work.

Capt. Wray does not know exactly how far from the center of the river the outside channel limits of the Calumet River go. According to him, how close the channel limits get to the edge of the river varies. He agrees it is necessary to obtain information about the river conditions, and he gets his information from Notice to Mariners and whatever is broadcast on the radio as Notice to Mariners from the Coast Guard. He listens to this broadcast regularly and he reads the faxed written notices as well. Although he does not recall listening to the broadcast on the day before the accident, he does listen regularly when he is on board, and if he was on the boat that day he listened to them. He also receives written Notices to Mariners. He does not recall having received any specific information about the condition of the river next to the Cronimet dock. He recalls nothing about the condition of the river in the area south of the 106th Street Bridge next to the Cronimet dock that day that was different from any other day. Although he received no specific information about the water levels in the Calumet River during that time, he knew that the water level was way down. He was not aware of the bottom contours of the river.

The testimony of G.E. Leithner, plaintiff's expert witness, was given by deposition. Leithner has been a marine surveyor since 1948. He does cargo damage surveys and hull damage surveys. He graduated from the Merchant Marine Academy in 1948. At one time he had a second mate's license, but that lapsed long ago. He has attended numerous continuing education courses since his graduation and has done many investigations. He was engaged by N.M.

Paterson & Sons to investigate the accident. He also concluded that the rudder of the Paterson grounded on either the river bottom or on debris on the river bottom, but within the channel limits. Indeed, this is what Coates appears to say in his redirect testimony. He concludes that if the Paterson had not collided with the underwater debris it would have left the navigable portion of the channel and, it follows, run aground shortly thereafter. This would imply that at least one of those involved had allowed the ship to end up in the situation in which not even extreme evasive action could have kept it from leaving the navigable portion of the channel and likely running aground. The testimony of Scott Hollister, a diver/surveyor who did a survey of the area on October 20, makes it pretty clear that if the ship had gone out of the navigable channel at that point, it would shortly if not immediately have run into the debris that was scattered throughout the bottom of the river near the crumbling dock.

The dock in question is the Cronimet dock made up of a southern part which has corrugated steel sheet piling for a retention wall, while the northern half does not. The northern half, made of concrete, is decaying and collapsing into the river. Rocky Frederick is the general manager at the dock for the Cronimet Corp., owner of the Cronimet dock. The dock is located just south of 106th Street on the east side of the Calumet River. From this location, Cronimet ships out stainless steel and nickel-chrome scrap by barge. Just below the 106th Street Bridge is one of the worst turns in the river. Because of that, the north part of the dock is unusable -- it is not possible to place barges at the north end of the dock for loading, as they obstruct passage. The condition of the north half has been the same for the last three years. Further, it seems that the tugboat captain and Capt. Houde both ought to have known of the debris on the bottom at this

point in the channel and that getting close to the edge of the navigable channel posed a considerable risk of running aground. Black testified that all of the captains were aware that water levels were down throughout the whole lake system and that, especially coming in when fully loaded down, they had to watch their depth carefully. Scott Hollister also testified that water levels were low. Capt. Wray also testified that at this time period, ships coming into the Calumet River were touching bottom in various places because of low water. Wray also testified that, except for the Paterson, ships started running lighter draft.

Plaintiff's expert Leithner concludes that the ship's hull never touched the dock or bank. If it had, it would have run aground much harder than what Houde described, as the rudder would have been in shallower water. Capt. Houde told Tim Black, N.M. Paterson & Sons' investigator and reporter, that he was convinced the ship had come in contact with the dock. So did the watchman. Upon inspection, however, Black found no evidence of the ship hitting the dock on the outside of the ship. It was later determined that the rudder had not come into contact with the dock. The only indication of hull damage he found was a mark in the engine room on one of the bulk heads which they eventually re-painted as it was not severe enough to require any repairs. Capt. Wray reviewed the area of the hull after the tow to see if there was any damage from striking the dock. All he observed was scratched paint, no damage. He does not recall whether the scratched paint was preexisting or new. Rocky Frederick did not learn of the October 7 accident until some months later, in December or January, when attorneys for the Paterson called him. After that he went down to inspect the edge of the dock to see if there was any damage from contact with the ship and there was no damage visible to him. Leithner is certain that the

vessel did not come hard aground. This opinion is based upon what Capt. Houde described, as well as the water depths reported by Hollister and the fact that the rudder is a certain distance above the bottom of the hull. Leithner determined the angle "of attack" of the ship to the dock by Capt. Houde's opinion based upon Houde's sighting of some towers when he visited the area subsequent to the accident. Houde states contact took place about halfway between the 106th Street Bridge and a part of the dock that was missing or washed out, which would be approximately 200 to 250 feet south of the 106th Street Bridge. Federal law sets the channel limits on the Calumet River. Leithner believes the depth is 27 feet for the Calumet in order to accommodate ocean ships, lakers, and bulk carriers. The river has to be dredged on a regular basis. This is done by the Army Corps of Engineers. At 20 feet from the dock is the location of the project limits, dredging limits, and Leithner expects 27 feet of water (the project depth) at that point. The channel is 200 feet from project dredging depth to project dredging depth on the opposite side. No law sets the depth of water in the area between the dock and the federal project channel. But between lines of channel, this witness would expect for the depth of the water to be no less than 27 feet. Leithner also opines that although water levels were low, they were not at record lows. Leithner does not know if the vessel grounded on the river bottom or on debris within the channel limits. He opines that the stern of the ship was absolutely not in the center of the channel. He believes the stern of the ship was at the federal navigation channel limits when the rudder ran aground -- approximately 20 feet off the face of that dock.

The testimony of diver/surveyor Scott Hollister was given by deposition. According to Hollister, he did a survey of the area along the Cronimet dock on October 20, 2000. The

Cronimet Dock immediately south of 106th Street is between 753 and 800 feet long, according to Leithner's deposition. Hollister found concrete piling debris and miscellaneous rubble on the bottom of the channel along the dock. The debris was scattered haphazardly across the bottom of the northern half of the dock, but not on the southern half. The debris was not found uniformly along the entire northern half of the dock, but rather, it was scattered randomly in various areas. He also took depth marks alongside the Cronimet dock at 20 feet out from the dock and at approximately every fifty feet. On page three of his report, he shows the water depth of approximately 15 to 18 feet over the northern half of the dock area which he surveyed. The southern half ranged from 22 to 28 feet. However, these were only rough measurements, and when challenged, he testified that it was not his intention to "split hairs." According to Hollister the depth is roughly 15 to 18 feet, but it could be 19 to 14, or 13 to whatever. It is, however, clearly shallower along the northern half of the dock than along the southern half. According to Hollister, the channel should have been dredged at 32 feet within the navigable channel, although the river bottom contours and gets deeper toward the center of the channel. Hollister agrees the river was low at the time he did his survey and that people were experiencing problems, but he is not aware of precisely how much lower than normal the water level was.

According to Hollister, he did a dive on the day of the accident in order to inspect the Paterson's rudder. He found no visible damage except at one area at the very aft end of the rudder on the bottom plating where it shined in a very small area as if it had recently contacted something. The contact point was at the trailing edge of the bottom quarter of the rudder and no larger than a coffee cup. Hollister opined that concrete could have caused this but so could many

14

other things. Clay, however, would not. According to Leithner, the point of contact of the rudder was evidenced by a heavy scuff at the aft end and at the very bottom of the rudder blade.

Tim Black inspected the damage when the ship was in dry dock. His inspection revealed that the rudder was twisted approximately 30 degrees to port. As to damages, Black identified deposition exhibit 6, a salvage association report, that reflected the following work done on the ship: (1) the rudder stock had to be stress-relieved; (2) the rudder stock had to be built up; (3) two new key ways cut into the rudder stock; (4) the tiller had to be re-fit; (5) the bushings were replaced in the intermediate and pintle; (5) the propeller blades were dressed up; (6) the aft end tail shaft seal was replaced; (7) all four steering gear rams were repaired; (8) repair to the bridge master radar; and (9) removal and replacement of old stern seal. The Court calculates damages in the following amounts: (1) repair costs $378,511; (2) lost profits for twenty-one days loss of use $177,884; and (3) consequential/incidental damages or crew repatriation $30,000. Total damages are $586,395 plus interest.

## ANALYSIS

This case is governed by admiralty law, and questions of negligence in maritime cases are treated as factual issues. *Folkstone Maritime, Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995). In order to succeed on any negligence theory, the plaintiff must establish that: (1) the defendant owed plaintiff a duty of care; (2) the defendant breached that duty; (3) and the defendant's breach was the proximate cause of plaintiff's injury. *Rhodes v. Ill. Cent. Gulf R.R.*, 665 N.E.2d 1260, 1267 (Ill. 1996). In this case, the proper standard to be applied is that a tug,

while neither a bailee nor an insurer, is obligated to provide reasonable care and skill "'as prudent navigators employ for the performance of similar service.'" *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1184 (5th Cir. 1984) (quoting *Stevens v. White City*, 285 U.S. 195 (1932)). The duty of the tugboat to the tow is to use ordinary care in performing the towage. *Geertson v. United States*, 223 F.2d 68, 71 (3d Cir. 1955). A tug is bound to act and avoid, so far as reasonable care and skill can afford, dangerous points in navigation that are known or should have been known to a master in charge of the tug. *Folkstone Maritime*, 64 F.3d at 1055 (citing *In re W.H. Baldwin*, 271 F. 411, 413 (2d Cir. 1921)). Further, "[n]avigators are not to be charged with negligence unless they make a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown." *Id.* (quoting *In re W.H. Baldwin*, 271 F. at 413).

When damages involve a tow or an entire flotilla, courts employ the "dominant mind" doctrine to "place liability on the tug and absolve the tow from liability." *In re TT Boat Corp.*, Nos. CIV. A. 98-0494, 98-1109, 1999 WL 123810, at *3 (E.D. La. Mar. 3, 1999) (citing 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 12-7 (2d ed. 1994)). The "dominant mind" doctrine provides that the vessel that is liable is the vessel whose people are actually in control of the operation. *Id.* (citing *Chevron U.S.A. Inc. v. Progress Marine Inc.*, No. CIVIL ACTION 77-463, 1980 A.M.C. 1637 (E.D. La. Aug. 24, 1979), *aff'd*, 632 F.2d 893 (5th Cir. 1980)). A tug is usually considered to be the "dominant mind" because it provides the "motive power." *Id.* (citing *Marathon Pipeline Co. v. Drilling Rig Rowan/Odessa*, 527 F. Supp. 824, 834 (E.D. La. 1981)). A tug that tows the tow into a collision is presumed to be at fault,

especially if that collision is with a stationary object. *Id.* (citing *Ryan Walsh Stevedoring Co., Inc. v. James Marine Serv., Inc.*, 557 F. Supp. 457, 461 (E.D. La. 1983), *aff'd*, 729 F.2d 1457 (5th Cir. 1984)). If the tug is the "dominant mind," the tug is responsible for knowledge of navigational conditions, including knowledge of channels, depth of water, obstructions, pipelines and other dangers to her tow. *Id.*

However, the presumption that the tug is the "dominant mind" is rebuttable. *Id.* (citing *Chevron*, 1980 A.M.C. 1637). If the tow breached a duty or acted in a negligent manner that contributed to the damages, the tow may be held partially or solely liable. *Id.* An arrangement that the tug is not the "dominant mind" can be made by agreement, expressed or implied from the circumstances. *Dow Chem. Co. v. Tug Thomas Allen*, 349 F. Supp. 1354, 1363 (E.D. La. 1972). If the tow is deemed to be the "dominant mind," "the tug is not liable provided the tug has obeyed the tow's orders and has not herself been guilty of negligence, either in the manner of executing the orders or by participating in an obviously dangerous maneuver." *Id.*

## DISCUSSION

The Court finds from the testimony that the relationship between the tugboat and the ship is as described by Coates and Houde. Neither the tugboat nor the Paterson was in complete control of the steering of the Paterson, rather, the navigation of the Paterson through the Calumet River out to Lake Michigan was a joint undertaking which required coordination between both captains. As indicated above, this is so because the Paterson was not a powerless barge but retained power to move itself and with its steering and bow thruster could steer that portion of

17

the ship while the Ethel E. by means of a line attached to the stern had influence over the stern of the ship as it led the Paterson stern first towards the lake. As described by Capt. Houde, the interaction between the tugboat and his crew was one of "teamwork" during which the tug would sometimes give him advice on what to do and vice versa. Although Capt. Houde, it appears, retained the ultimate authority to make a final decision as to steering, both captains were responsible for keeping the Paterson from coming aground, at least in the sense that both were responsible to warn the other and initiate corrective measures if it became known to them that the ship was coming too close to the river bank.

In this regard, the failure of communication between Capt. Houde and McDonald is key. It is this failure that interfered with Capt. Houde's ability to judge whether the ship was coming too close to the Cronimet dock. Indeed, Capt. Houde never did realize the ship was in danger until warned by Capt. Wray. The defendant, the Ethel E., of course, had nothing whatsoever to do with this failure of communication -- whatever its cause. McDonald was a crew member of the Paterson, not the Ethel E. The equipment, *i.e.*, the radio being used by McDonald, belonged to the Paterson, not the Ethel E, and McDonald's deployment was not within the Ethel E.'s control. A major cause of the accident was the failure of the Paterson's captain to receive accurate information from his first officer as to the distance of his ship's stern from the side of the channel. The Ethel E cannot be held responsible for this failure.[6]

_____

[6] Capt. Houde testified he was seeking his first mate's input for only one minute before the tugboat captain sent his warning. The record does not reflect whether a minute's time would have been sufficient to avoid the accident, but Capt. Wray believes the time of the communication failure was three to four minutes. The spotters, Capt. Houde testified, would help to confirm what the tugboat was doing and notify him if the tugboat was not keeping the

Although the Ethel E. cannot be held responsible for the communication failures of the Paterson's first officer, it can be held responsible for failing to take advantage of its superior position to observe what was happening by warning the Paterson sooner. Certainly, Coates believes that the Ethel E.'s captain should have made better use of the fact that he was in a better position than the Paterson to see the proximity of the boat to the side of the dock and warn the Paterson earlier. Capt. Houde's testimony lends some credence to that. The last communication before the accident from the tugboat captain was "that I had to give him a hand otherwise he wouldn't make it by himself. So then at that time the engine was four on the pitch ahead and the rudder was hard over to port and then as he talked to me then I put the engine full head." From this communication, the Court infers that the tugboat captain was the first to see that the ship was in trouble. Further, Capt. Houde testified that he could not see if the tug was keeping the Paterson's stern in the middle of the channel: "Well, I asked to keep her in the middle as much as he could, but I can't tell if at the time he talked to me if the stern of the ship was in the middle or not, I can't tell . . . . Because he is the one who sees that down there."

Capt. Wray testified that he could not see how close the ship was to the east bank because he was on the port side trying to pull the ship back towards the middle. However, this testimony is not entirely dispositive of the issue. Of course, when he was pulling almost horizontally to the ship in an effort to avoid the grounding, he would not be able to see the ship's distance from the east bank because the ship itself would be in his line of sight. However, even in this position, he

---

boat in the middle of the channel.

19

could tell how close the ship was coming to the east bank by the distance of the ship from the west bank. In this regard his crucial testimony is:

> The deck crew had not said signals in a while, and with glare in the windows, I could not tell right away the ship was sheering off to port.

So it appears that this is the crucial error. If he had been able to tell right away that the ship was sheering off to port, then as he had done hundreds of times before, Capt. Wray could have made the necessary adjustments, or advised Capt. Houde to make the necessary adjustments, or both, to the ship's line of direction to successfully navigate the turn.

The fact that Capt. Houde took immediate appropriate action when he was advised of the situation by the tugboat captain and that, in spite of this, it was only 10 or 15 seconds after he initiated the remedial action that he felt the contact with the ground, would tend to indicate that the captain was not warned soon enough to avoid contact with the shallower water near the bank of the river and the subsequent damage. Thus, the warning to maneuver away from the dock did not come soon enough. The ship was allowed to drift too close before corrective action was initiated. From the testimony, the Court concludes that the responsibility for avoiding such a situation was with both the captain of the Paterson and the captain of the Ethel E, in that they were required to work together in order to keep the ship as close to the center of the river as possible. Each had control over certain aspects of the ship's ability to maneuver. As part of their joint responsibility to keep the ship centered, each was responsible for knowing the ship's distance from the river bank, and both were negligent in failing to do so until it was too late. This negligence resulted in the grounding of the ship and the resultant damage thereto.

That the captain of the Paterson had responsibility for this is clear from the fact that he posted spotters at crucial points on the ship to keep him constantly informed of the distance between the ship and the river bank -- as required by his own operation manual. Moreover, Capt. Houde himself testified that he tries to stay twenty to thirty feet from the bank of the river. He does not wait to get that close before he commences remedial measures. This is not the testimony of a captain who awaits passively for directions from the tugboat. Further, the uncontradicted testimony is that he became quite angry when he was unable to get continuous reports from his first officer during the crucial minutes just before the accident. In addition, we know that Capt. Houde reported that he would not wish to sail with that same first officer again as he does not believe he could trust him; and that the first officer was actually fired as a result. And finally, the testimony of the plaintiff's expert and captain himself that the operation and steering of the ship out of the river was a joint undertaking, like a team, between the ship and the tugboat places responsibility squarely on the shoulders of Capt. Houde as well as Capt. Wray.

Although Capt. Wray testified that he was simply there to follow orders from the captain of the ship, he also testified that it was his job to keep the ship as close to center as possible. That was, in fact, the order given to him by Capt. Houde. In addition, we know he considered this to be a crucial part of his job because he indicated that he himself listened for and depended in part upon the reports of the spotters aboard the Paterson. The failure of the Paterson's spotters to give accurate information regarding the distance of the ship to the bank at the crucial point in time when the ship was making a tight turn contributed to the failure of both captains to recognize in time to take corrective action that the ship was coming too close to the shore. The

Ethel E.'s failure to discern immediately that the ship was coming too close to the shore was also due in part to glare on the windows of the pilot house through which the captain was looking and his reliance upon information from the Paterson's spotters -- information that was not forthcoming. Further, we know that Capt. Wray was aware of the fact that at a crucial point in time, Capt. Houde was not able to communicate with his spotters as he, Capt. Wray, was listening in on the radio traffic between Capt. Houde and his first officer. But Capt. Wray could, as he testified, have stepped away from the controls for a brief moment in order to open a door step, outside the pilot house, and check the distance himself. Or, he could have had either or both members of his crew provide the information for him. He did neither, and as a consequence he did not realize that the ship was sheering off, as he put it, until it was too late. There was no failure to take corrective action once the situation became clear. Capt. Wray informed Capt. Houde that he needed to take immediate corrective action and Capt. Houde did so. Yet, only 10 or 15 seconds later the ship struck either the ground or the debris on the ground.

Capt. Wray was late in realizing the situation and therefore his warning was too late. He should have much more quickly adjusted to the fact that there was no information coming to either captain from the spotters on the Paterson at this crucial juncture and increased his efforts to obtain the information he needed to fulfill his responsibilities. First officer McDonald, however, was more than merely late. He failed totally to give any warning whatsoever. He completely failed in his duty to provide crucial information at a crucial point in time. Were it not for Capt. Wray's warning, the grounding would have been much more severe. Had Capt. Wray failed as totally in his duty to judge the distance between the ship's stern and the river bank as did the

22

Paterson's first officer, McDonald, the incident would have been much more severe.

To the extent that the grounding was caused either because the water level was low or because there was debris on the bottom of the channel that close to the shore, both parties, again, bear responsibility. The testimony is clear that both the captain of the Paterson and the captain of the Ethel E. are considered to have sufficient knowledge of all of the conditions of the river such that it was not necessary to hire a pilot to take command of the ship. Thus, each should have known, and apparently did know, that the water levels of the river were quite low and that other ships were having problems in that regard. Further, both were charged with the knowledge, whether they actually had such knowledge or not, of the conditions of the contours of the river bottom at that location. Thus, both should have known that there was debris at the river bottom that resulted in a reduction in the water depth which necessitated keeping the ship further away from the edge of the navigable channel at that location than would otherwise be required. The testimony of diver/surveyor Scott Hollister is that the navigable channel is deeper in the center than at the banks. Therefore, the closer the ship remains to the center of the river, the less likely it is to strike any obstruction on the river bottom. Common sense tells us that when the waters are particularly low, keeping the ship in the center of the channel becomes even more important than under normal conditions. Yet neither captain took any extra precautions or exerted any special efforts in that regard. Further, the testimony makes it clear that the cement of the Cronimet dock at that particular point had been crumbling into the river for a long period of time, at least three years. It does not take any special expertise to conclude that there is likely to be debris at the bottom of the river from the crumbling dock at that location. Nor is this a new or

recent condition that neither captain could have foreseen. Certainly, Capt. Wray, with some forty years of experience operating tugboats in and around the Calumet River, ought to have observed this condition and made adjustments for it. Indeed, the parties have stipulated that Capt. Wray was aware of the dilapidated, falling-in-the-river condition of the Cronimet dock, at least with reference to the outside of the navigable channel. No expert testimony is needed to come to the further conclusion that such debris could, over the course of years, migrate into the edge of the navigable channel. This is a matter of common sense. Any rational person would draw the conclusion that if a dock is crumbling into the river, the river bottom contour in that area is likely to be affected. Yet, neither captain, it appears, took any extra pains or precautions in that regard. Neither went out of his way to determine to what extent such debris might have moved into the navigable channel or the extent of concrete on the river bottom at that area. That similar ships could have made this turn if kept close enough to the center of the channel is without question. Both captains had previously done that on hundreds of occasions between the two of them. Apparently, both simply relied upon doing things in the same manner as they had successfully done them in the past. Yet common sense tells us that the closer the ship came to the bank, the greater the risk of running aground. This risk was particularly acute at this point in time because of the condition of the dock and its likely effect on the river bottom contour and the unusually low level of the waters. Both captains ought to have known this and taken measures to keep the ship from coming any closer to shore at that point than is actually required. Neither did so. The Paterson's lookouts failed, and the Ethel E. took no additional measures to ascertain for itself the distance to the riverbank. In this regard, it matters not whether the ship actually left the navigable channel. Given the condition of the dock at that particular point in the river, the tight

turn involved, and the dangerously low waters of the river at that time, both captains were negligent in allowing the ship to come within a few feet of the edge of the navigable channel. It was an unwarranted and unnecessary risk which resulted in damage to the ship. Moreover, the testimony is clear that had the ship not run aground by striking debris a few feet short of the edge of the navigable channel, it would surely have crossed beyond the navigable channel and run aground even closer to the east bank of the river, possibly striking the dock itself, before anything could be done to turn it. Indeed, there is some testimony to support the conclusion that the ship actually struck the dock.

Based upon the total failure of the Paterson's spotter to perform his function to provide vital information to both captains, the failure of the Ethel E. to adapt to circumstances and to recognize the ship's position relative to the river bank until it was too late, the failure of both captains to fully appreciate and adjust to the danger posed by the deteriorating condition of the Cronimet dock given the seriously low level of the river waters, and the totality of the circumstances, the court finds that the plaintiff's negligence is 45 percent of the total negligence, the defendants M/V Ethel E., William C. Selvick and Curley's Marine Towing's negligence is 40 percent of the total negligence and the negligence of the Cronimet Corp. for the hazard created by its total disregard for the longstanding deteriorated condition of its dock is 15 percent of the total negligence. As previously indicated, the Court calculates damages in the following amounts: (1) repair costs, $378,511; (2) lost profits for twenty-one days loss of use, $177,884; (3) and consequential/incidental damages or crew repatriation, $30,000. Total damages are $586,395 plus interest. Forty percent of this figure is $234,558.00. Judgment is entered in favor of

plaintiff and against defendants M/V Ethel E., William C. Selvick and Curley's Marine Towing

in this amount plus interest.

**SO ORDERED**                    **ENTER:**  9/21/04

**RONALD A. GUZMÁN**
**District Judge**